UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA    :
   :
v.    :     No. 3:18-cr-333 (VLB)
   :
AMBER FOLEY    :
    Defendant.    :     January 13, 2020
   :
   :
   :
   :
   :

## MEMORANDUM OF DECISION DENYING DEFENDANTS MOTION TO DISQUALITY [DKT. 128]

Before the Court is Defendant Amber Foley's motion to disqualify the undersigned from presiding over this case pursuant to 28 U.S.C. § 455(a), Federal Rule Criminal Procedure 11(c)(1), the Sixth, and Fourteenth Amendments to the United States Constitution, as supplemented. [Dkt. 128, 136 (Mot. to Disqualify)]. The Government joined the motion. [Dkt. 137]. The Defendant also moved for a dismissal of charges, which the Government did not join. [Dkt. 137]. For reasons set forth below, the Court DENIES the Defendant's motion for disqualification and for the dismissal of charges.

## Background

Ms. Foley stands before the Court charged by indictment with one count of distribution of child pornography in violation of 18 U.S.C. § 2252 A(a)(2) and one count of production of child pornography in violation of 18 U.S.C. § 2251(a). [Dkt. 74]. Ms. Foley was originally charged by complaint with the lesser offense of

distribution of child pornography, at which time she stipulated to probable cause in a hearing before Magistrate Judge Donna F. Martinez. [Dkt. 12 (Pre-trial detention hearing and probable cause hearing, 01/19/2018 at 11:57-35-12:00:43)]. Later, the Government secured an indictment charging Ms. Foley with the additional offense of production of child pornography. [Dkt. 74]. The later more serious offense, production of child pornography, carries a higher mandatory minimum sentence and higher statutory maximum sentence than distribution of child pornography. [*Id.* at 11:07:02-11:07:53].[1] The sentence for each offense can be imposed consecutively. Ms. Foley pled not guilty to both charges before Magistrate Judge Robert A. Richardson. [Dkt. 85].

The Government extended a plea offer, and after Ms. Foley rejected the offer, the Government moved the Court to order a *Frye* hearing. [Dkt. 99]. This Court granted the motion and referred the matter to Magistrate Judge Richardson. [Dkt. 101]. During the July 12, 2019 *Frye* hearing before Judge Richardson, Ms. Foley stated that she understood the Government's plea offer and the consequences of either accepting or rejecting the offer and the facts supporting it. [*Frye* hearing at 11:12:07-11:13:17, 11:20:00-11:20:38].

At the *Frye* hearing, Ms. Foley's attorney, Mr. Bussert, correctly advised Mr. Foley that the Court could impose consecutive sentences, totaling 50 years'

---

[1] *Compare* 18 U.S.C. § 2251(e) (mandatory minimum of 15 years' incarceration and statutory maximum of 30 years' incarceration for production of child pornography) to 18 U.S.C. § 2252(A)(b)(1) (mandatory minimum of 5 years' incarceration and statutory maximum of 20 years' incarceration for distribution of child pornography).

incarceration. [*Id.* at 11:15:00-11:15:40]. The Government stated that they would seek approval to re-offer the initial plea if Ms. Foley indicated that she would accept the initial offer to plead guilty to the lesser offense of distribution of child pornography by July 18, 2019. [*Id.* at 11:11:26-11:12:03].

With the consent of defense counsel, the Government was permitted to briefly proffer the evidence that the Government would introduce at trial in its case in chief for Ms. Foley's consideration. [*Id.,* 11:21:31-11:22:52]. That evidence included written statements purportedly made to law enforcement by Ms. Foley, images and text messages purportedly created by Ms. Foley, and cooperating witness testimony. *Ibid.* Ms. Foley did not decide whether to accept the Government's proposal at the *Frye* hearing. [*Id.* 11:24:40-11:25:28].

About three months later, the parties informed the Court that they intended to proceed with trial. [10/01/2019, email from Bussert to Courtroom Deputy Shafer]. The Joint Trial Memorandum (the "JTM") was filed on October 15, 2019. [Dkt. 111]. Included among the evidence the Government intended to offer were the statements, text messages and images to which the Government referred at the *Frye* hearing. There were no motions to suppress or *in limine* on the docket.

Shortly after that, Magistrate Judge Robert M. Spector held bond compliance hearings on October 25, 2019 and October 28, 2019, respectively, to consider whether Ms. Foley was compliant with the conditions of pretrial release. [Dkt. 117]; [Dkt. 119-120]. The hearings arose because residents of the Virginia Wells Transitional House, where Ms. Foley was residing under supervision, filed a

grievance, claiming that Ms. Foley threatened them. [Dkt. 115 (Gov. Resp. to Pet. for Action) at 7-8]; [Dkt. 116 (Def. Opp.) 3-4].[2] During the October 28, 2019 hearing, U.S. Senior Probation Officer Nicole Owens ("Officer Owens") expressed concern about Ms. Foley's behavior, mental health, and mental health treatment while residing at the Virginia Wells Transitional House. [Bond violation hearing, 15:14:56-15:15:18:20, 15:29:20-15:31:28, 15:32:40-15:33:00]. Magistrate Judge Spector then ordered the U.S. Probation Office to intensify its supervision of Ms. Foley by checking in with the staff at the Virginia Wells Transitional House "twice each week to update Defendant's status and progress at the home" and compliance with the conditions of pretrial detention. [Dkt. 119]. The record expressly addressed concerns about the continuity of Ms. Foley's mental health treatment. [Dkt. 15:44:20-15:45:00, 15:47:00-15:49:06].

After reviewing the docket, the JTM, and the record at the second bond revocation hearing, the Court became concerned about the possibility that Ms. Foley may not be competent to stand trial. Prior to the scheduled start of jury selection on November 19, 2019, the Court had not personally observed the Defendant, since pretrial matters were previously handled by three magistrate judges.

---

[2] The Court notes that the Petition for Action on Ms. Foley's bond was not on the docket during the events at issue in this motion. Thus, I did not review the specific contents of the petition at that time but was aware of its general contents from the parties' briefing [Dkt. 115-116] and the audio recording of the two hearings before Magistrate Judge Spector. After another bond violation before Magistrate Judge Spector on December 19, 2019 on new issues, the Petition for Action was eventually docketed. [Dkt. 145].

Upon learning of Ms. Foley's pretrial adjustment issues the court had concerns about Ms. Foley's competency. Given the discontinuity, the Court sought guidance from supervising probation officer, Senior Probation Officer Owens, by telephone on November 4, 2019. Specifically, the Court asked (1) if Officer Owens had concerns about Ms. Foley's mental competency to stand trial based on her own observations, and (2) whether her clinicians expressed any concern about her competency. *See* [Ex. A. (10/30/2019 Diamond scheduling email to Owens)].[3] Officer Owens reported that she was not yet familiar with Ms. Foley because the officer assigned her case retired and the case was reassigned to Officer Owens recently. Officer Owens also reported she had not yet received Ms. Foley's mental health treatment records. Officer Owens was directed to gather additional information from Ms. Foley's clinicians, evaluate this information with respect to Ms. Foley's competency, and report her observations and assessment to the Court.

Law Clerk, Attorney Matthew Diamond, followed up with Officer Owens by email on November 12, 2019. [Ex. A (11/12/2019, Diamond email to Owens)] Specifically, Mr. Diamond inquired about whether Officer Owens had the opportunity to obtain information from Ms. Foley's clinicians. *Ibid*. The Court understood that this information was previously requested by Officer Owens but delays resulting from personnel matters at the Virginia Wells Transitional House or

---

[3] The first contact with Probation occurred on October 29th. Mr. Diamond called Officer Owens at 4:25 P.M. The call lasted approximately four minutes. The first call was made at the Court's direction and for the purposes of scheduling a future call with the Court and for ascertaining what information she presently had available concerning Ms. Foley's competency and any initial impressions on her competency.

at the mental health services organization impaired her ability to access it or consult the appropriate resource.

In response to Mr. Diamond's email requesting a status update on Officer Owens's review, she sent a detailed email to Mr. Diamond addressing information about Ms. Foley's current mental health status which pertained to her competency. [Ex. A (11/13/2019, Owens email to Diamond)]. Supervisory U.S. Probation Officer Michael Rafferty ("Officer Rafferty") also attended Officer Owens's meeting with Ms. Foley. *Ibid*. Officer Owens's email reflects that she inquired about whether Ms. Foley understood the severity of the pending charges and the potential outcome of trial, not her position on any plea offer. *Ibid*.

One paragraph of the email discusses Ms. Foley's spontaneous unsolicited comments about the plea offers. *Ibid*. It also addresses discussion between Ms. Foley and Officers Owens and Rafferty about how a potentially adverse outcome would affect her familial relationships. *Ibid*. The email primarily discusses inconsistency in Ms. Foley's mental health treatment and Officer Owens's personal observations of Ms. Foley's behavior. *Ibid*. The email chain, which is attached as an exhibit to this opinion, was made available to defense counsel and the Government at the November 19, 2019 hearing.

Officer Owens also called Mr. Diamond on November 15, 2019 at approximately 2:00 P.M. to confirm his receipt of her November 13th email and to inquire about whether the Court required any additional information or had any questions about Ms. Owens's report. During their call, Mr. Diamond confirmed that

Officer Owens was not concerned about Ms. Foley's competency to stand trial. The Court directed Mr. Diamond to instruct Officer Owens to inform defense counsel of Ms. Foley's unsolicited comments about the plea offers. *See* [Ex. A, 11/18/2019, Diamond email to Owens].

In response, Mr. Bussert alerted the Government to his call with Officer Owens. [Dkt. 128 at 8]. Mr. Bussert represents that Officer Michael Rafferty then called Mr. Bussert and stated that the purpose of the meeting with Ms. Foley was to discuss housing, community support and counseling services. *Ibid.* Mr. Bussert represents that he repeated what Officer Owens had relayed to him to Officer Rafferty. *Ibid.* Mr. Bussert represents that Officer Rafferty confirmed that defense counsel "seemed to have a solid idea of what we discussed." *Ibid.* Mr. Bussert further represents that Officer Rafferty then "made clear that the Probation Office did not *sua sponte* initiate the plea-related discussion," to which Mr. Bussert stated that he "made it equally clear that [he] had no reason to believe that it did." *Ibid.* Mr. Bussert then informed the Government of his call with Officer Rafferty. *Ibid.*

On November 19, 2019, the Court granted a continuance until November 25, 2019, provided the parties with copies of Exhibit A, and explained why the Court's requested that Officer Owens assess Ms. Foley's competency. [Dkt. 130] After reviewing this information, Defendant requested that the Court proceed with ruling on the Motion to Disqualify. *Id.*

Defendant seeks disqualification, claiming the Court's request that Probation speak with Ms. Foley reflects its assumption that Ms. Foley is guilty and because

the Court violated Rule 11 of the Federal Rules of Criminal Procedure and reflects the Court's prejudgment of the case.

Defendant argues that the Court directed Officer Owens to contact Ms. Foley for the purposes of "plea-related discussions," violating Fed. R. Crim. P. 11(c)(1)'s "bright line rule" against the Court's participation in plea negotiations and therefore warrants disqualification. [Dkt. 128 at 11-16]. Defendant's supplemental briefing expounds further on Fed. R. Crim. P. 11(c)(1) and claims that this issue irreparably damaged the attorney-client relationship, requiring dismissal of the charges. [Dkt. 136 at 14-16].

Ms. Foley has not moved, or otherwise expressed a desire, for new counsel to be appointed.

## Legal Standards

### I. Standard for Disqualification

Defendant moves for disqualification pursuant to 28 U.S.C. § 455(a), which states "[a]ny justice, judge, or magistrate judge of the United States *shall disqualify himself* in any proceeding in which his impartiality might reasonably be questioned." (emphasis added)

 "By its own terms, section 455 does not provide relief to a party seeking to cause a court to recuse itself from a case; rather, it acts as a self-governing directive for the district court." *United States v. Trudeau*, No. 10-CR-234 (JCH), 2016 WL 591754, at *3 (D. Conn. Feb. 11, 2016). Section 455 itself is "wholly silent about

procedure." *United States v. Int'l Bus. Machines Corp.*, 475 F. Supp. 1372, 1377 (S.D.N.Y. 1979), *aff'd sub nom. In re Int'l Bus. Machines Corp.*, 618 F.2d 923 (2d Cir. 1980).

The First Circuit stated generally that "[a]lthough a trial judge faced with a § 455(a) disqualification motion may, in her discretion, leave the motion to a different judge, no reported case or accepted principle of law compels her to do so...." *In re United States*, 158 F.3d 26, 34 (1st Cir. 1998) (citations omitted). *Accord United States v. Heldt*, 668 F.2d 1238, 1271 (D.C. Cir. 1981); *see also Azam v. Brown*, 714 F. App'x 663, 665 (9th Cir. 2017) ("It was not error for a different district judge to adjudicate the disqualification motion because 28 U.S.C. § 455 does not preclude independent review by another district judge"). By comparison, the Seventh Circuit held that "Section 455 clearly contemplates that decisions with respect to disqualification should be made by the judge sitting in the case, and not by another judge." *Schurz Commc'ns, Inc. v. F.C.C.*, 982 F.2d 1057, 1059 (7th Cir. 1992).

The decision whether to grant or deny a recusal motion is a matter confided to the district court's discretion. *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). District court judges within this District and the Second Circuit routinely rule upon motions for recusal under § 455(a), including in criminal matters. *See Trudeau*, No. 10-CR-234 (JCH), 2016 WL 591754, at *3 (D. Conn. Feb. 11, 2016); *United States v. Baadhio*, No. 3:08-CR-14 (VLB), 2011 WL 13195948, at *2 (D. Conn. Oct. 27, 2011); *United States v. Jones*, No. 3:99CR264(AHN), 2002 WL 32086511, at *3 (D. Conn. Aug. 16, 2002)*; United States v. Barth,* No. CRIM. N-90-5 (AHN), 1996 WL 684396, at *1 (D. Conn. Oct. 10, 1996).

The statutory standard requires that a judge recuse herself whenever her "impartiality might reasonably be question," 28 U.S.C. § 455(a), "is commonly limited to those circumstances in which the alleged partiality "stem[s] from an extrajudicial source." *United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) (citing *Liteky v. United States*, 510 U.S. 540, 544 (1994)). The reason being that an extrajudicial source could result "…in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966).

The test employed to determine whether recusal is required is an objective one. *See In re Basciano*, 542 F.3d 950, 956 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 1401 (2009). The existence of the appearance of impropriety is determined "not by considering what a straw poll of the only partly informed man-in-the-street would show[,] but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988). "The sensitive question of whether to recuse a judge, the test of impartiality is what a reasonable person, knowing and understanding all the facts and circumstances, would believe." *Id.* at 1309.

Thus, the standard is not based on the parties' subjective belief of apparent bias, or even a judge's subjective belief that she is impartial, but rather consideration of the relevant facts and law from an informed, objective standard. In ruling on a motion to recuse herself, the judge must conduct an objective analysis of all the facts from the standpoint of a neutral observer to assess whether

a reasonable person could perceive her to be bias. The Court makes this assessment not from the perspective of a layperson, but with an understanding of the law. *Id.* at 1313.

The moving party must overcome a presumption of impartiality, which is a substantial burden. *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Intern. Union*, 332 F. Supp. 2d 667, 670 (S.D.N.Y. 2004). "A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1312. Section 455(a) motions do not require that the Court accept all of the allegations of the moving party as true. *Farkas v. Ellis*, 768 F. Supp. 476, 480 (S.D.N.Y. 1991).

## II.    Competency standard

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). To do so, would violate due process. *Pate v. Robinson*, 383 U.S. 375 (1966).

The two-pronged test for evaluating a defendant's mental competence requires the Court to determine (1) whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and (2) whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v United State*s, 362 US 402 (1960); *see also United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995). In the federal courts, competency is

determined by a preponderance of the evidence. 18 U.S.C. § 4241(d). "In making a determination of competency, the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment." *United States v. Schlueter*, 276 Fed. Appx. 81, 83 (2d Cir. 2008) (citing *Nichols*, 56 F.3d at 411).

A determination of competency can be made without the benefit of a hearing. "Neither the federal statute governing competency determinations, 18 U.S.C. § 4241, nor the Due Process Clause requires a hearing in every instance; a hearing is required only if the court has 'reasonable cause' to believe that the defendant has a mental defect rendering him incompetent." *Nichols*, 56 F.3d at 414 (citing 18 U.S.C. § 4241(a)). However, due process requires the Court to hold a hearing on a defendant's competency if there is sufficient evidence to cast doubt. *Pate*, 383 U.S. at 385-86.

A judge has a duty to assess the mental state of a defendant's whose competency is in doubt. The Court may order a competency hearing *sua sponte* on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to stand trial. 18 U.S.C. § 4241(a). Thus, the Court has an independent duty to assure that an incompetent defendant not proceed to trial and need not wait for counsel for the defendant or the government to initiate a competency inquiry.

The fact that a district judge may have some initial, unanswered doubts about a defendant's competency to stand trial does not itself warrant a competency

hearing. *United States v. Fields*, 45 F. App'x 738, 740 (9th Cir. 2002), *cert. denied*. 123 S.Ct. 940 (Jan. 13, 2003). The court may assess a defendant's competency through other means at its disposal.  The district court in *Fields* considered, among other sources, the probation officer's statement to the court that she did not feel that a mental examination would be "worthwhile" in determining that a competency hearing was unnecessary. *Id.* at 741. The prosecution's appellee brief in *Fields* explains that the district court judge asked the probation officer whether in her "professional opinion *... it would be worthwhile to have any kind of a study done with regard to [defendant's mental health] or status," and the probation officer responded, "No, I don't think so." (RT 8/6/01: 52-53; GER 261-262)." The probation officer had met with the Defendant "at least 30 times. " *United States, Plaintiff-Appellee, v. Harold Henry* Fields, Defendant-Appellant., 2002 WL 32116762 (C.A.9), 13-14.

### III.     Role of the U.S. Probation and Pretrial Services System

"The USPO is "a legally constituted arm of the judicial branch." *United States v. Inserra*, 34 F.3d 83, 88 (2d Cir.1994); see 18 U.S.C. § 3602(a) ("A district court of the United States shall appoint qualified persons to serve ... as probation officers within the jurisdiction and *under the direction of the court* making the appointment.")(emphasis added). A probation officer is a confidential adviser to the court and has been regarded as "the court's 'eyes and ears,' a neutral information gatherer with loyalties to no one but the court." *United States v. Reyes*, 283 F.3d 446, 455 (2d Cir. 2002). Probation officers are charged with gathering the essential facts necessary for the court to perform its function. *See, e.g., Dorman v.*

*Higgins*, 821 F.2d 133, (1987). The presiding judge is dependent on and entrust the probation officer to gather this essential information. *Schiff v. Dorsey*, 877 F. Supp. 73, 77 & n.1 (D. Conn. 1994).

Federal probation officers discharge this function in a variety of ways. Included among them is gathering information during the routine supervision of the pre-trial releasee. *See* 18 U.S.C. § 3154. In addition to pretrial services reports, "officers also help prepare other reports for the court, including reports that address the accused's adjustment to supervision and their compliance with conditions of release." OFFICE OF PROBATION AND PRETRIAL SERVICES, ADMIN. OFFICE OF THE U.S. COURTS, *The U.S. Probation and Pretrial Services System: A Vital Part of the Judiciary* (2007), available at http://www.ctd.uscourts.gov/ctp/. Of particular relevance here "[f]rom early on, the probation officer's role of a social worker was explicitly recognized…Educational requirements for probation officers generally reflected this social work focus." Sharon M. Bunzel, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 YALE L. J., 4, 933, 944 (1995). Today, a cursory review of job opportunity postings for U.S. Probation Officers in this District within the past few years shows a continued emphasis on academic credentials in social work and experience in related fields. *See, i.e.* D. Conn. U.S. Office of Probation, Job Opportunity Announcement, 17-CT-02.

## Legal Analysis

### The Judge To Whom the Motion is Directed Should Decide the Motion to Recuse

Before considering the merits of Defendant's motion, the Court must consider what procedures to employ. As stated in *Int'l Bus. Machines Corp.*, 475 F. Supp. at 1377, § 455(a) is wholly silent on procedure. The statute itself provides a clear mandate: a judge must disqualify *herself*. "The reason for this is plain. The judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion." *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1312).

The parties do not cite and the Court is unaware of any binding precedent in the Second Circuit that requires or even suggests the transfer of the motion to another judge or necessitate an evidentiary hearing. Additionally, § 455 does not require any evidentiary hearings. Here, the record is sufficient for this court to render a decision.

### The Record Established the Court had Well-founded Doubts about the Defendant's Competency

As explained from the bench on November 19, 2019, the Court's concern was that Ms. Foley may not have been competent to stand trial. The Court had insufficient information to ascertain whether its concerns were well founded and whether there was "reasonable cause" to schedule a competency hearing.

Ms. Foley had previously appeared before Magistrate Judges Martinez and Spector several times to address her pretrial compliance, both early on in the case and again almost immediately before jury selection approached. Concerns about Ms. Foley's mental health and the inadequacy of her mental health treatment were raised in a bond violation hearing before Magistrate Judge Spector on October 28th.

15

[Dkt. 119]. Magistrate Judge Spector was sufficiently concerned about Ms. Foley's mental health treatment and behavior he ordered the U.S. Probation Officer, by then Officer Owens, to increase the frequency of her supervision. He ordered her to check-in with the Virginia Wells Transitional house where Ms. Foley was ordered to live as a condition of pretrial release twice a week to assess her "status and progress at the home." *Ibid.* This was an unusually intense degree of supervision, particularly for a pretrial defendant in a residential placement.

Previously, Magistrate Judge Donna F. Martinez held a Bond Violation Hearing on September 20, 2018 after Ms. Foley accessed the internet app "MeetMe," in violations of the conditions of her release. This internet app was the same medium by which Ms. Foley is alleged to have distributed child pornography and accessing it was a direct violation of the terms of her pre-trial release. [Dkt. 71]. Ms. Foley's noncompliance with the conditions of pretrial release was highly unusual in general and even more unusual for a person charged with offenses carrying such severe penalties.[4] Her inability to comport to these minimal

---

[4] The Court's concern about Ms. Foley's aberrant conduct while on pre-trial release is empirically supported. On average, between 2008 and 2015, less than 15% of released defendants committed any violation of the terms of pre-trial release. Thomas H. Cohen & Amaryllis Austin, *Examining Federal Pretrial Release Trends over the Last Decade*, 82 J. OF FED. PROBATION 2, Fig. 5. (Sept. 2018). The technical violation rate drops to 10% for the Defendant's "most serious offense charged" data category (public order offense, other). Mark Motivans, Bureau of Justice Statistics, U.S. Dep't. of Justice, *Federal Justice Statistics, 2013- Statistical Tables NCJ 249150, Table 3.3 Behavior of federal defendants released to the community pending trial, by offense, Oct. 1, 2012-Sept. 30, 2013* (2017). But, Ms. Foley belongs among an even smaller subset of criminal defendants not separately represented by the data: those defendants with multiple violations of the terms of pre-trial release.

standards suggested she did not understand the significance and consequence of the proceedings.

No one had enough contact with Ms. Foley to assess her mental health. Magistrate Judges Martinez, Richardson, and Spector all handled various portions of the pre-trial proceedings. In addition to the arraignment, bond, and violation pretrial hearings, the only other court proceeding was a *Frye* hearing which by definition was limited to assuring Ms. Foley understood the terms of the Government's plea offer. The fact that Ms. Foley suffered from a mental health condition did not arise until the October 25, 2019 violation hearing before Magistrate Judge Spector. Probation Officer Stackpole had just retired and Senior Probation Officer Owens was assigned to supervise Ms. Foley shortly before the hearing. Even as trial was imminent Senior Probation Officer Owens did not have access to information necessary to render an opinion about Ms. Foley's mental health status.

Ms. Foley is facing serious charges. As explained to Ms. Foley during the *Frye* hearing, the length of Ms. Foley's possible exposure to incarceration increased significantly as a consequence of the indictment; the mandatory minimum sentence tripled, the applicable statutory maximum sentence increased by 10 years, and she is exposed to total term of 50 years' incarceration if convicted on both counts and the sentences ran consecutively. Ms. Foley's aberrant conduct on pre-trial supervision in the face of such serious charges, coupled with prior concerns on the record over her mental health condition and treatment, suggested that she may not rationally understand the nature and consequences of the

proceedings against her. The *pro forma* canvassing of the Defendant at the *Frye* hearing did not eliminate this concern because her difficulty adjusting to pre-trial release continued after the *Frye* hearing.

Contextually, Connecticut Department of Children and Families ("DCF") was not supportive of Ms. Foley having even as little as one-hour weekly supervised visits with her child. [Dkt 115. at 5]. DCF reportedly commenced proceedings to terminate her parental rights in December 2018, with trial set to commence in December 2019, prior to her criminal trial. [*Id*. at 7-8]. Ms. Foley's mother had previously withdrawn support, as Magistrate Judge Richardson granted Ms. Foley's mother's request to be released from her co-signor and third party custodian obligations after she was indicted on the production of child pornography charge. [01/15/19 Detention Hearing, 14:40:40-14:41:49, 15:55:58-15:56:07]. The October 2019 pre-trial release violation proceedings before Magistrate Judge Spector suggested that the Defendant's unusually poor adjustment to supervision, despite facing serious charges, may be rooted in mental health conditions.

Thus, the Court was obliged to investigate her competency further.

### Probation Is Responsible For Gathering Information for the Court To Determine A Defendant's Competence to Stand Trial

Ms. Foley was entitled to have the Court assess her competency to assure that she was able to understand the nature and consequences of the proceedings and assist in her defense. 18 U. S. C. §4241(a). On October 29th, the eve of trial and days after Ms. Foley's mental health was questioned at the hearing before

Magistrate Judge Spector, the Court contacted Ms. Foley's supervising probation officer to discuss (1) whether Officer Owens had any concern about Ms. Foley's competency to stand trial based on their interactions, and (2) whether any of Ms. Foley's clinicians raised any concerns about her mental capacity. Unfortunately, due to her recent appointment, Officer Owens did not have a sufficient professional relationship with Ms. Foley to provide the requested information on November 4th. In addition, while Ms. Foley executed a release permitting Officer Owens to review her mental health records, Officer Owens had not yet received them from any of Ms. Foley's providers because of personnel issues at the Virginia Wells Transition House or at the mental health services organization. The information requested by the Court was information that Officer Owens was already entitled to know.

As addressed above, U.S. Probation Officers routinely provide their observations and assessments of a defendants' out of the courtroom behavior to the trial judge. They are neutral fact gatherers and serve as an essential source of information and analysis based on their expertise in pyscho-social issues, given their experience and academic training. Defendant agrees that "the parties are familiar with PO Owens, and the undersigned knows her to be both professional and familiar with the type of mental health issues with which those whom the Probation Office supervises present." (sic) [Dkt. 136 at 10]. Considering the views of a probation officer in evaluating whether a competency hearing is necessary is not improper, even when the probation officer's opinion is based on a totality of *ex parte* contacts with the defendant. See *Fields*, 45 F. App'x at 740.

Unlike *Fields*, where the probation officer had contact with the defendant over thirty times, Officer Owens was instructed to share the information she would gather during the robust supervision previously ordered by Magistrate Judge Spector. Mr. Diamond's emails to Officer Owens made clear the Court's interest was strictly confined to Ms. Foley's mental status for the purposes of considering whether a competency hearing was necessary. [Ex. A]. Officer Owens was not tasked with preparing a "psychiatric or psychological report" pursuant to 18 U.S.C. § 4241(b). Rather, the Court took her professional views into account in determining whether additional steps were warranted, which could have included a psychiatric or psychological report by a qualified professional if reasonable caused emerged.

During her meeting with Ms. Foley, Officer Owens asked questions confined to an assessment of Ms. Foley's competency. She did not raise the issue of plea negotiations. She asked Ms. Foley if she understood the severity of the pending charges and the potential outcome, one of the questions typically asked to assess a defendant's ability to understand the nature and consequences of the proceedings and assist in their defense. Ms. Foley raised the issue of plea negotiations by commenting that she would consider the original plea offer. Officer Owens did not respond to Ms. Foley's reference to a plea offer and instead redirected the conversation to Ms. Foley's competence, asking her if she understood the consequences should she receive a lengthy sentence. [Ex. A, 11/13/2019 Owens email to Diamond]. This does not suggest that Officer Owens or

the Court expressed an opinion on the weight of the evidence, or that pleading guilty would be more or less favorable to the Defendant than proceeding with trial.

The record establishes that the Court acted consistent with its constitutional and statutory duty to *sua sponte* consider whether a criminal defendant is competent to stand trial. In doing so, the Court properly considered the experience of the probation officer, a court officer required to follow its direction, and thus the information provided by the supervising probation officer is not from an extrajudicial source. *See U.S. v. Douglas*, No. 2:07-CR-119, 2008 WL 1902087, at 4 (D. Vt. Apr. 25, 2008).

In *Douglas*, the district court judge met with the Pretrial Services Officer prior to a detention hearing for a defendant charged with federal sex offenses, which revealed confusion about who actually owned the property where the defendant would prospectively reside pending trial. *Id*. at 2. The district court's chambers staff then conducted online public record searches, revealing that a registered sex offender resided at the property, not that it was owned by the defendant's wife as represented to the officer. *Ibid*. On the record, the court addressed its chambers staff's discovery and the seriousness of the charges pending against the defendant, including the mandatory minimum term of incarceration. *Idid*. The defendant then moved to recuse the district court judge. The district court denied the defendant's motion, noting that "there is no meaningful distinction between Judge Sessions requesting this information from the pretrial services officer, requesting it from a member of his chambers staff, or procuring it himself." *Id*. at 4. The court concluded that the ownership and residency data was not an

extrajudicial source because it derived from the public record and "it was within the Court's responsibilities to be informed of the suitability of the proposed release placement." *Ibid*. In doing so, the Court explicitly stated its motivation for the records search at issue and rejected the defendant's contention that it was to challenge his or his wife's credibility. *Ibid*.

Here, like *Douglas*, contact with the probation officer is not an extrajudicial source because the query into a defendant's competency is properly within the Court's responsibilities and the probation officer is an officer of the court, required to follow the Court's direction. *See* 18 U.S.C. § 3603(8)(b). The two queries posed to Officer Owens address the competency issue exclusively: 1) whether Officer Owens had any concern about Ms. Foley's competency to stand trial based on their interactions, and (2) whether any of Ms. Foley's clinicians raised any concerns about her mental capacity.

Officer Owens was already entitled to the information sought by the Court by virtue of her assignment as Ms. Foley's supervising pre-trial services officer, further exemplified by the extraordinary degree of monitoring ordered by Magistrate Judge Spector, and by Ms. Foley's release of her mental health treatment information to Officer Owens. See [Dkt. 119]. It is axiomatic that a probation officer have access to such information because the assessment of a supervisee's mental health, by among other things, reviewing their mental health records, discussions, and observation, is an integral part of pretrial supervision of a defendant with a history of mental illness Only if an officer is equipped with

this information can an officer provide the types of support and services a supervisee needs to comport with the required standards of conduct.

Since neither the queries nor the source of the information before the Court implicate an extrajudicial source, recusal is only warranted in the rarest of circumstances, evidenced by a degree of deep seated antagonism or favoritism. *Liteky v. United States*, 510 U.S. at 555. The Defendant has failed to show how any reasonable person informed of all relevant facts and the law could call the Court's ability to preside in an impartial manner into question. The defense has cited no facts tending to show the Court harbors antagonism or favoritism towards Ms. Foley.

## The Court did not Violate Federal Rule of Criminal Procedure 11(c)(1)

The Defendant argues that Fed. R. Crim. P. 11(c)(1) imposes a "bright-line" rule that bars participation by the judge in the plea negotiation process, citing *U.S. v. Werker*, 535 F.2d 198. [Dkt. 128 at 12]. This is an inaccurate statement of the law in the Second Circuit. In *United States v. Paul*, 634 F.3d 668, 672 (2d Cir. 2011), the Second Circuit qualified its earlier holding in *U.S. v. Werker*, 535 F.2d 198 (2d Cir. 1976) and expressly rejected the bright-line rule accepted by other circuits after *Werker*.

> The Second Circuit's only significant decision regarding Rule 11(c)(1) is *United States v. Werker*, 535 F.2d 198 (2d Cir.1976), but the facts in *Werker* were particularly unusual—the defendant attempted to plea bargain directly with the court. *Id.* at 201, 205. Some Circuits have indeed espoused a "bright-line" rule regarding remarks made by a trial court that touch on topics related to plea discussions. *See, e.g., United States v. Cano–Varela*, 497 F.3d 1122, 1134 (10th Cir.2007) ("[T]he court's comparison of a post-trial sentence to a post-plea sentence was inherently coercive."); *Bruce*, 976 F.2d at 555 ("The

command of [Rule 11(c)(1) ] with regard to plea negotiations is simple and admits of no exceptions."). But a closer review of the relevant caselaw suggests that a more discriminating examination of the remarks at issue—and the context in which they were made—is the more prudent approach. We need not adopt a particular standard to apply to all potential 11(c)(1) situations. It suffices simply to say that a "bright-line" rule is inappropriate for such an analysis. Issues arising under Rule 11(c)(1) are highly fact-specific and, as a result, such "situations must be analyzed in terms of the purposes of the rule, and not with illogical rigidity." *United States v. Moses*, No. 05 Cr. 133, 2010 WL 3521724, at *15 (D.Vt. Sept. 7, 2010) (citing *Cano–Varela*, 497 F.3d at 1133–34; *United States v. Frank*, 36 F.3d 898, 902 (9th Cir.1994)).

*Paul*, 634 F.3d at 672.

The Defendant and the Government are correct in noting, as a general principle, that the court's participation in plea negotiations is prohibited because it "inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty." *Id.* at 671. (quoting *United States v. Bruce*, 976 F.2d 552, 556 (9th Cir. 1992)). In *U.S. v. Davila*, 569 U.S. 597, 610-11 (2013), the U.S. Supreme Court held that Fed. R. Crim. P. 11(c)(1) was adopted as a prophylactic measure and not one impelled by the Due Process Clause or any other constitutional requirement.

Judicial participation in plea discussions was common practice before Fed. Crim. P. R. 11(c)(1) was enacted in 1974. *See* Advisory Committee's 1974 Note on Subd.(e)(1). The commentary to the amendment explains that the rule is targeted at avoiding judicial advocacy over a preferred disposition of the criminal charges. The rule is aimed at mitigating "[t]he risk [that] not going along with the disposition apparently desired by the judge might induce the defendant to plead guilty, even if innocent." *Ibid.* The commentary quotes Informal Opinion No. 779 of the ABA Professional Ethics Committee, stating, in relevant part, that "a judge should not

be a party to advance arrangements for the determination of a sentence, whether as a result of a guilty plea or finding of guilt based on proof." *Ibid*. "When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office." *Ibid*. (citing *United States ex rel. Elksnis v. Gilligan*, 256 F. Supp. 244, 254 (S.D.N.Y. 1966) (emphasis added).

The 1974 commentary contrasts the cases of *People v. Earegood*, 12 Mich.App. 256, 268-269 (1968) with *Kruse v. State*, 47 Wis.2d 460, 177 N.W.2d 322 (1970) to explain what constitutes "participation." *Ibid*. In *Earegood*, Michigan's intermediate-level appellate court rejected a literal interpretation of the identical language of Fed. Crim. P. 11(c)(1) relevant provision contained in ABA Guilty Plea standard 3.3(a) because it conflicted with ABA Guilty Plea standard 1.8(a)'s permissive consideration of granting charge and sentence concessions to a defendant who enters a guilty plea. *Earegood*, 12 Mich.App. at 267-269. In essence, the trial judge tacitly "participates" whenever the judge's perceived views on sentencing are considered by the party in their negotiations. *Ibid*. *Earegood* rejected the literal interpretation of "participates" in favor of a functional application: prohibiting threats or promises by a judge to impose a particular sentence because they are unduly coercive on a defendant. *Id*. at 277-280. In that case, the "defendant could reasonably understand the trial judge to be saying that he was a busy man with a long memory and those who run the gauntlet unsuccessfully will be dealt with more severely than those who plead guilty." *Ibid*.[5]

---

[5] The opinion quotes the trial judge's statement on the record at a calendar call:

By comparison, *Kruse v. Wisconsin*, 47 Wis.2d 460 (1970), denied vacatur of a guilty plea even though the defense counsel and the prosecutor met with the judge in chambers twice regarding the plea agreement in the absence of the defendant. The defendant had been generally canvassed on the record and nothing in *Kruse,* as compared to *Earegood,* suggests that the trial judge advocated for a guilty plea. *Id.* at 465-468. As *Kruse* demonstrates, a trial judge has a role in the plea bargaining process when canvassing a defendant as to a plea, but that too cannot constitute "participation" under Fed. R. Crim. P. 11(c)(1). This is reinforced by the 1974 commentary to Rule 11 which explains that, judicial advocacy over plea terms is problematic because "such involvement makes it difficult for a judge to objectively assess the voluntariness of the plea."

*Earegood* remains correct in rejecting an expansive interpretation of "participate." For example, the Court does not "participate in plea discussions" within the meaning of Fed. R. Crim. P. 11(c)(1) when it conducts a *Frye* hearing "where the Court strives to ensure a full and accurate communication on [plea terms and conditions that may be favorable to the accused] has occurred." *See United States v. Albarran*, 943 F.3d 106, n. 5 (2d Cir. 2019) (defining the court's role in a *Frye* hearing). *United States v. Khazaee*, 710 F. App'x 1, 3 (2d Cir. 2017)

---

'I think it is about time to make my usual announcement, gentlemen. The purpose of this call is to get pleas. If you are going to plead or waive a trial by jury now is the time to do it, so we can schedule. The court has a long memory, and all this goes on record, and when it comes time for sentence, *259 if you plead or waive a jury at the last minute, it is a factor I take into consideration in sentencing. I am sure you all know the risk.'

*People v. Earegood*, 12 Mich. App. at 258–59.

confirms that the prohibition against "participation in plea discussions" remains a functional analysis, directed at whether the Court is advocating a particular disposition. (denying vacatur because the district court never advised or encouraged the defendant to plead guilty, discussed the sentence it would impose, or otherwise exerted "pressure to settle on terms favorable to the judge"). Similarly an expansive interpretation of the term participate would preclude a judge from any role in the plea process including canvassing a defendant before and accepting a plea. Both the *Frye* and the plea acceptance roles are neutral and do not involve advocating for acceptance of a plea offer.

Here, the facts do not establish that the Court "participated" in the negotiation of a plea bargain in any manner, as none of the facts suggest that the Court's actions could be construed as advocating a particular disposition of the criminal charges. The Defendant's states that Officer Rafferty informed Mr. Bussert that the Probation Officer did not initiate plea related discussions with the Defendant. [Dkt. 128 at 8]. Mr. Bussert concedes that he has no reason to believe otherwise. *Ibid*.

Critically, at the time the court directed Officer Owens to assess Ms. Foley's mental health the court record indicated there was no plea offer. The record of the *Frye* hearing indicated the government withdrew its offer when Ms. Foley decided not to plead. Furthermore, the parties had informed the Court that the parties were going forward with trial. Thus to the knowledge of the Court and the Probation Office, there was no offer to discuss and no expected negotiations.

The Court could not have been aware of the status of the plea offers at the time that it undertook consideration of Ms. Foley's competency. Based on Mr. Bussert's representation in the motion, a second plea offer was made on November 12, 2019, over a week *after* the Court directed Officer Owens to gather additional information and report back about Ms. Foley's current mental health status for determining whether additional steps were necessary to evaluate her competency. See [Dkt. 128 at 4]. Nothing on the record so much as suggest the Court or Probation Officer Owens was aware of this privately-conveyed plea offer.

Mr. Diamond's November 18th email also demonstrates that, once the Court learned of Ms. Foley's spontaneous remark regarding the initial plea, the Court requested that Officer Owens alert Mr. Bussert to his client's comments. [Ex. A, 11/18/19, Diamond email to Owens)]. To the Court's knowledge at that point, there was no offer because the Government stated at the *Frye* hearing it would seek approval to re-offer the initial plea if Ms. Foley indicated that she would accept the initial offer to plead guilty to the lesser offense of distribution of child pornography by July 18, 2019. [*Id.* at 11:11:26-11:12:03]. The Court did not ask Probation Officer Owens to speak to Ms. Foley until months after that deadline and the parties and informed the court the case would be going to trial which would only occur if the defendant had not pled. One of the reasons the court asked Officer Owens to convey the information to Mr. Bussert was the fact that the Court believed there was no pending offer. Nothing in this email exchange or the Court's conversation with Officer Owens could be reasonably interpreted to suggest that the Court suggested that the plea offer be revived.

The Defendant inexplicably and erroneously assumes that since Officer Owens contacted him at the Court's direction to share his client's spontaneous comment about a plea offer, that the Court also directed Officer Owens to elicit Ms. Foley's position on whether she considered pleading guilty or attempted to influence her in some way. [Dkt 128 at 7]. Officer Owens's November 13, 2019 email to Mr. Diamond explains, quite clearly, how Ms. Foley spontaneously interjected her view of the relative merits of two different plea offers. [Ex. A, 11/13/2019 Owens email to Diamond].

First, Officer Owens and Ms. Foley discussed the status of the DCF proceeding, which was a possible mental health stressor. *See* also [Dkt. 141, Probation Petition for Action]. Then, Officer Owens asked if Ms. Foley understood the severity of the charges and potential outcome of her trial, issues at the heart of competency. *Ibid.* Officer Owens then stated Ms. Foley stated that at this point she is facing 15 years' incarceration whether she accepts a plea or proceeds with trial. She prefaced the last statement with the following comment "So it doesn't matter anyway. My kids are my life and why I fight." *Ibid.* Apparently, her comments to Officer Owens compared her statutory minimum sentence if convicted on 18 U.S.C. § 2251(e) with an unsolicited plea offer presented to her privately by Mr. Bussert on November 13th. [Dkt. 128 at 4-5]. Ms. Foley's statements reflect an obvious misunderstanding about the potential consequences in her case. For example, Ms. Foley could be acquitted of one or both of the charges at trial or could be convicted or plead guilty and be sentenced above the mandatory minimum for the distribution of child pornography charge. It is for this reason and not to intrude in the

nonexistent plea negotiations the Court directed Officer Owens to convey Ms. Foley's comment to her attorney.

In response to Ms. Foley's statement, Officer Owens discussed Ms. Foley's familial arrangements, which again, weighs as a consideration in whether she has a rationale understanding of the proceedings, not whether any particular plea or course of action is advisable or preferred by the Court. When the Court learned of the spontaneous comments concerning her plea offer, the Court redirected her comments to the appropriate party-her attorney. The Court made no suggestion of the sentence it would consider if Ms. Foley was convicted or pled guilty.

The Court's comments on the record on November 19, 2019 about the potential sentence range that could be imposed under the statutes that Ms. Foley is alleged to have violated simply repeated what Ms. Foley had been already told at the *Frye* hearing by her counsel and the Government with her counsel's consent. The Court did not suggest that it *would* impose any particular sentence or exert pressure to settle on particular terms. *See Khazaee*, 710 F. App'x at 3.

Nothing in the Court's comments on the record on November 19, 2019, the emails exchanged between Officer Owens and the Court's law clerk, Officer Owens and Rafferty's conduct in supervising Ms. Foley, or background included in this opinion establish that the Court "participated" in plea negotiations, directly or indirectly, in violation of Fed. R. Crim. P. 11(c)(1).

## The Defendant's motion for dismissal

The Defendant does not cite any authority for the proposition that dismissal of the charges is required. The Court cannot conclude that the attorney-client relationship has been irreparably harmed when the Defendant has not moved, or otherwise expressed a desire, for new counsel to be appointed. Notably, the Defendant had previously exercised this right. [Dkt. 67].

As stated above, Fed. Crim. P. R. 11(c)(1) was not violated. Moreover, as *Davila*, 569 U.S. at 611 explains, "Rule 11(c)(1) does not belong in the highly exceptional category of structural errors—e.g., denial of counsel of choice or denial of a public trial—that trigger automatic reversal because they undermine the fairness of the entire criminal proceeding." Because recusal is not required pursuant to § 455(a), the Court cannot conclude that proceeding before the undersigned would deprive Ms. Foley of any constitutional right.

Finally, Ms. Foley is entitled to a speedy trial. U.S. CONST. amend VI. The speedy trial clock stops when a substantive motion is filed and remains suspended for a reasonable time for the Court to render a ruling. 18 U.S.C. § 3161(h)(1)(D). The Court's ruling on this motion was reasonable, given the complexity of the issues, intervening holidays, and court closures. Ms. Foley was not deprived of her right to a speedy trial.

## Conclusion

For the aforementioned reasons, the Court DENIES Defendant's Motion to Disqualify the undersigned. The Court also DENIES Plaintiff's motion for Dismissal.

Jury selection will proceed on January 21, 2020 at 9:30 A.M. in Courtroom Three, 950 Main Street, Hartford Connecticut. If the parties are unprepared to proceed on that date, they must show good cause for a continuance, file a speedy trial waiver signed by Ms. Foley, and inform the Court within seven (7) days of the date of this order of their mutual availability during the remainder of this calendar year.

**IT IS SO ORDERED.**

*Vanessa Lynne Bryant*

Vanessa Bryant
2020.01.13
15:45:43 -05'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

Dated at Hartford, Connecticut: January 13, 2020