UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | CRIM. NO.3:18cr333 (VLB) |
| | : | |
| | : | |
| AMBER FOLEY | : | |

MEMORANDUM IN OPPOSITION
TO GOVERNMENT'S MOTION TO CONTINUE[1]

Amber Foley's desire for a trial, specifically, a speedy trial that gives effect to her legally recognized rights, is well established. See Doc. 155 (incorporated herein by reference), 222 (same), 230 (same), 271 (same). A venire panel has been summoned, and the parties are available for jury selection tomorrow. See Doc. 282 at 4:01-5:11. Yet, the government submits that no further effort should

---

[1] Where the Court indicated that the government would file its motion by yesterday "afternoon," see Doc. 282 at 23:10, on information and belief, the government's motion was docketed at approximately 11:00 pm, by which time the undersigned had left the office and was without my computer. Where Ms. Foley believes the instant memorandum sufficient to confirm and preserve her opposition to the government's request, to the extent the Court believes additional briefing is merited, Ms. Foley would respectfully request leave to supplement, having made every effort to file by the Court's noon deadline. Id. at 23:06.

be made to allow Ms. Foley's trial to move forward on November 16, as scheduled, based on the supposition that "there is almost no likelihood that a jury could be empaneled." Doc. 286 at 2; but see Doc. 282 at 21:34 ("facts as opposed to supposition" unpersuasive). Respectfully, the government's request should be denied. A refusal to make a good faith effort to empanel a jury, thereby denying any chance that trial can proceed as scheduled, is a refusal to recognize or give effect to a criminal defendant's speedy trial rights.

## EMPANELING A JURY

Central to the government's request is the assertion that "the state of the pandemic in this District is such that a jury cannot be safely seated at this time." Doc. 286 at 2; id. 10 ("concern for public safety"), id. 11 ("the public risk is too high to require those jurors to return to the courthouse"). In this regard, it cites Governor Lamont's November 5 Executive Order, 9K, noting a limitation on private gatherings. Id. 12.

Executive Order 9K is enclosed herewith. Ex. 1. As the Court can see, among other things, it permits religious gatherings and indoor graduation ceremonies of up to 100 people. It is thus unclear what the

government's purpose is in citing it.[2]  Leaving aside that the government does not claim that the Court's COVID-19 accommodation strategy violates any state orders, the practical reality is that large, socially distanced gatherings do take place every day in Connecticut, namely in the public-school systems.

The undersigned has one high school- and elementary-aged children.  The former has attended school under a hybrid model (in-person and remote) since the start of the school year, while the former have been in-person daily since the second week of school.  That schools can operate and remain open (i.e., not shut down for cleaning[3]) even when members of their communities test positive for COVID-19, which has occurred regularly at the high school, belies any hyperbolic assertion seeking to abridge defendants' rights.  See Doc. 286 at 19 ("grave picture of the actual—and not just possible—risks of searing a jury at this time").

---

[2] On its face, Executive Order 9K does not speak to private gatherings. While it may be that prior orders 9K renews impose limits on such gatherings, the government's motion does not cite those.

[3] The undersigned notes that as I exited the courthouse yesterday, security personnel at the front entrance was processing people into the building.

3

The government further cites to recent COVID-19 positivity rate data.  A review of data available at CovidActNow confirms both the cited positivity rate and a general upward trend.  Again, this comes as



no surprise.  Doc. 222 at 4-6.  Equally, if not more significant, no new General Order has issued.  To the contrary, posted on the District Court's Web site is a video message that addresses juror and public safety.

As noted, federal courts across the country have been holding jury trials since June, and the Administrative Office of the Courts has provided written guidance regarding how jury trials can be conducted

during a pandemic. Doc. 271 at 4 n. 2. Where, yesterday, the Court suggested providing "facts" to substantiate information received via an informal inquiry of colleagues, the undersigned compiled the enclosed survey of criminal jury trials that have occurred since COVID-19 caused closures nationwide. Ex. 2.[4] The information therein is taken from the cited dockets and other, hyperlinked publicly available information. Further, where able, information is offered about specific measures that courts took to empanel juries so as to ensure "the right to a speedy trial guaranteed by law and by the Constitution."

    Several aspects of the survey merit attention. First, beyond the Western District of North Carolina trial referenced yesterday, at least two other districts resumed trials in June (and WDNC actually had two that month). Second, while courts varied in their use of questionnaires, from written to electronic (via SurveyMonkey—NDCA)

---

[4] To be clear, the undersigned does not believe that the enclosed, which documents more than two dozen trials, represents every federal criminal jury trial that has taken place subsequent to district courts re-opening from COVID-19 closures. Quite the opposite. Colleagues are identifying more (by case name) as this is being written, and the undersigned has a good faith that more trials in more districts have occurred. Sensitive to the Court's admonition, the undersigned shall continue to work to substantiate such matters, as able.

to none, they have all ultimately had venire persons appear in-person, employing safety measures consistent with that which the court has used here. Third, two of the referenced trials resulted in acquittals while four produced split verdicts, thereby affirming the power of the jury trial to vindicate defendants. Fourth, in a District of Massachusetts trial last month that involved charges similar to, if not more serious than, Ms. Foley's, a jury was empaneled in two days. In acknowledging this reality, the government confirms that there have, in fact, been other "child exploitation trial<u>s</u> during the pandemic in <u>several jurisdictions</u>." Doc. 286 at 14.

Of course, this latter consideration belies the government's assertion that Ms. Foley's case is "ill-suited to be one of the first trials" in this District — a claim the government makes for the first time in its motion and without specifying the "particular risks [...] associated with this case" that (meaningfully) distinguish it from any other criminal case that might proceed to trial under prevailing or anticipated COVID-19 conditions. Doc. 286 at 13.[5] Indeed, the bases for the

---

[5] Where the government references a preference for trials with "local witnesses" (again, for the first time), Doc. 286 at 15, it provides no information regarding positivity rates in the communities from which it

6

government's assertions in this respect are entirely unclear.[6] Where the government cites to circumstances that arose in an Eastern District of Kentucky trial—again, the nature of the charges is immaterial to what occurred, it seems significant that only members of the prosecution team appear to have tested positive for COVID-19. Not to trivialize what occurred, but the clear inference is that team members, when outside the courtroom, may not have taken appropriate precautions. Indeed, the failure of outside law enforcement to wear masks when visiting Wyatt is considered a cause

---

witnesses will appear. Similarly, and importantly, it does not claim that its witnesses disregard COVID-19 safety measures or would refuse to abide by the protocols that the Court long ago announced to ensure the health and safety of all who appear in court (e.g., testing, quarantining).

[6] On the one hand, the government submits that it "is not opposed to the Court resuming trials." Doc. 286 at 13. On the other hand, it contends that "convening a jury for a trial [...] during a re-surging pandemic is unchartered territory" and that "[e]ven if a jury could be empaneled, the current COVID0-19 rates [...] suggest that it is extremely likely something will go wrong to prevent the trial from reaching deliberations and a verdict." Id. 14, 15. It is unclear how "a trial of this nature" is distinct, let alone less "suited for an in-person trial in the coming months" than any other federal criminal case, especially given the prior ability to empanel a jury in one day (infra). Id. The government's apparent conflation of the "nature of the case" with pandemic-related considerations that might impact the availability of potential jurors is unfounded and without merit.

for the recent COVID-19 outbreak that has impacted detained defendants.  See Katie Mulvaney, [Federal judge questions Wyatt prison officials about coronavirus outbreak as case spike](#), Providence Journal (Oct. 22, 2020) (Warden Martin "suspected the outbreak is linked to either auditors from the U.S. Marshals who were inspecting the facility, at times without masks, or to an asymptomatic Wyatt employee").

The government submits that "[e]ven before the pandemic," the nature of this case "presented unusual challenges" and "required an extra-large venire panel."  Doc. 286 at 1.  Ms. Foley is uncertain how the government defines panel size (S, M, L, XL, XXL, etc.).  However, the Judge's List provided the parties on January 28, 2020 contains 64 names.  Accounting for both the large portion of the panel that was excused following comments by the first panelist to take the microphone and others excused for cause, from that group of 64 a jury was selected in one day.[7]  Aside, perhaps, from inopportune comments

---

[7] Ms. Foley is without information regarding how many summons were issued to produce a panel of 64.

that served to taint the panel, there was nothing "unusual" about the prior jury selection.

As it stands, we have 18 venire persons (of the 150 to whom summons were sent, on or about October 8, 2020), whom the Court has not struck for cause, as well as another 50 who have been summoned to appear. A minimum 31 venire persons are required to empanel a jury of 12 plus one alternate. The government's supposition as to what this group will bear relative to empaneling a jury that will allow the trial to proceed as scheduled is not persuasive, particularly when weighed against Ms. Foley's rights. <u>See</u> Doc. 286 at 11 (presupposing ratios and cause excusals).

## NEXT STEPS

For the above reasons, and any others the Court may deem appropriate and just, Ms. Foley respectfully requests that jury selection proceed tomorrow. In view of the responsiveness issues to date, Ms. Foley respectfully submits that the Court can and should invoke its contempt powers relative to making clear to those summoned (and not already excused) their civic obligations and the consequences for ignoring the Court's call to appear. It should not be

the case that citizens elsewhere appear for jury duty, and serve, but those in Connecticut can be allowed to disregard their civic responsibilities. See Ex. 2.

As noted on October 29 and subsequently, it is anticipated that to the extent Ms. Foley's trial does not proceed, as scheduled, she will renew her request that the instant prosecution be dismissed, with prejudice. See Doc. 286 at 5 (noting defendant's intentions). Again, through such a motion Ms. Foley would expect to address the Court's prior findings and determinations, as well as related legal considerations. That she does not do so here, particularly in the time available (see Note 1), should not be seen as either a waiver of claims related thereto or, in any way, agreement with the government's reference to those findings or its arguments (e.g., prejudice). See Moore v. Arizona, 414 U.S. 25, 26 (1973) (violation of the Speedy Trial Clause may occur even absent any affirmative demonstration of prejudice to the accused); Doc. 286 at 2-3, 16-18.

Finally, consistent with prior requests and while not waiving any claims that may be raised through a renewed dismissal motion (ante), to the extent that the instant trial is continued, Ms. Foley requests

that hers remain the first trial conducted in the Hartford seat of court. More specifically, it should not be that the inability to empanel a jury for Ms. Foley's long scheduled trial (should that come to pass) serves to move another defendant before her.  *Qui prior est tempore potior est jure*, a maxim applicable to where equities are equal.  See <u>Neslin v. Wells</u>, 104 U.S. 428, 441 (1881).

                                          Respectfully submitted,

                        BY:  /s/ Todd Bussert
                              Todd Bussert, CT24328
                              FROST BUSSERT LLC
                              350 Orange Street, Suite 100
                              New Haven, CT 06511
                              (203) 495-9790; Fax: (203) 495-9795
                              tab@frostbussert.com

                              Attorney for Amber Foley

# CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                    /s/ *Todd Bussert*
               Todd A. Bussert